(Slip Opinion)	OCTOBER TERM, 2015	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VOISINE ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 14–10154.   Argued February 29, 2016—Decided June 27, 2016

In an effort to "close [a] dangerous loophole" in the gun control laws, *United States* v. *Castleman*, 572 U. S. ___, ___, Congress extended the federal prohibition on firearms possession by convicted felons to persons convicted of a "misdemeanor crime of domestic violence," 18 U. S. C. §922(g)(9).   Section 921(a)(33)(A) defines that phrase to include a misdemeanor under federal, state, or tribal law, committed against a domestic relation that necessarily involves the "use . . . of physical force."   In *Castleman*, this Court held that a knowing or intentional assault qualifies as such a crime, but left open whether the same was true of a reckless assault.

Petitioner Stephen Voisine pleaded guilty to assaulting his girl-friend in violation of §207 of the Maine Criminal Code, which makes it a misdemeanor to "intentionally, knowingly or recklessly cause[ ] bodily injury" to another.   When law enforcement officials later investigated Voisine for killing a bald eagle, they learned that he owned a rifle.   After a background check turned up Voisine's prior conviction under §207, the Government charged him with violating §922(g)(9).   Petitioner William Armstrong pleaded guilty to assaulting his wife in violation of a Maine domestic violence law making it a misdemeanor to commit an assault prohibited by §207 against a family or household member.   While searching Armstrong's home as part of a narcotics investigation a few years later, law enforcement officers discovered six guns and a large quantity of ammunition.   Armstrong was also charged under §922(g)(9).   Both men argued that they were not subject to §922(g)(9)'s prohibition because their prior convictions could have been based on reckless, rather than knowing or intentional, conduct and thus did not quality as misdemeanor crimes of domestic violence.   The District Court rejected those claims, and each

petitioner pleaded guilty.  The First Circuit affirmed, holding that "an offense with a *mens rea* of recklessness may qualify as a 'misdemeanor crime of violence' under §922(g)(9)."  Voisine and Armstrong filed a joint petition for certiorari, and their case was remanded for further consideration in light of *Castleman.*  The First Circuit again upheld the convictions on the same ground.

*Held*: A reckless domestic assault qualifies as a "misdemeanor crime of domestic violence" under §922(g)(9).  Pp. 4–12.

(a) That conclusion follows from the statutory text.  Nothing in the phrase "use. . . of physical force" indicates that §922(g)(9) distinguishes between domestic assaults committed knowingly or intentionally and those committed recklessly.  Dictionaries consistently define the word "use" to mean the "act of employing" something.  Accordingly, the force involved in a qualifying assault must be volitional; an involuntary motion, even a powerful one, is not naturally described as an active employment of force.  See *Castleman*, 572 U. S., at ___.  But nothing about the definition of "use" demands that the person applying force have the purpose or practical certainty that it will cause harm, as compared with the understanding that it is substantially likely to do so.  Nor does *Leocal* v. *Ashcroft*, 543 U. S. 1, which held that the "use" of force excludes accidents.  Reckless conduct, which requires the conscious disregard of a known risk, is not an accident: It involves a deliberate decision to endanger another.  The relevant text thus supports prohibiting petitioners, and others with similar criminal records, from possessing firearms.  Pp. 5–8.

(b) So too does the relevant history.  Congress enacted §922(g)(9) in 1996 to bar those domestic abusers convicted of garden-variety assault or battery misdemeanors—just like those convicted of felonies—from owning guns.  Then, as now, a significant majority of jurisdictions—34 States plus the District of Columbia—defined such misdemeanor offenses to include the reckless infliction of bodily harm.  In targeting those laws, Congress thus must have known it was sweeping in some persons who had engaged in reckless conduct.  See, *e.g., United States* v. *Bailey*, 9 Pet. 238, 256.  Indeed, that was part of the point: to apply the federal firearms restriction to those abusers, along with all others, covered by the States' ordinary misdemeanor assault laws.

Petitioners' reading risks rendering §922(g)(9) broadly inoperative in the 35 jurisdictions with assault laws extending to recklessness.  Consider Maine's law, which criminalizes "intentionally, knowingly or recklessly" injuring another.  Assuming that statute defines a single crime, petitioners' view that §921(a)(33)(A) requires at least a knowing *mens rea* would mean that *no* conviction obtained under that law could qualify as a "misdemeanor crime of domestic violence."

Syllabus

*Descamps* v. *United States*, 570 U. S. \_\_\_, \_\_\_. In *Castleman*, the Court declined to construe §921(a)(33)(A) so as to render §922(g)(9) ineffective in 10 States. All the more so here, where petitioners' view would jeopardize §922(g)(9)'s force in several times that many. Pp. 8–11.

778 F. 3d 176, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined as to Parts I and II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–10154

_____

## STEPHEN L. VOISINE AND WILLIAM E. ARMSTRONG, III, PETITIONERS *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 27, 2016]

JUSTICE KAGAN delivered the opinion of the Court.

Federal law prohibits any person convicted of a "misdemeanor crime of domestic violence" from possessing a firearm. 18 U. S. C. §922(g)(9). That phrase is defined to include any misdemeanor committed against a domestic relation that necessarily involves the "use . . . of physical force." §921(a)(33)(A). The question presented here is whether misdemeanor assault convictions for reckless (as contrasted to knowing or intentional) conduct trigger the statutory firearms ban. We hold that they do.

I

Congress enacted §922(g)(9) some 20 years ago to "close [a] dangerous loophole" in the gun control laws. *United States* v. *Castleman*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 2) (quoting *United States* v. *Hayes*, 555 U. S. 415, 426 (2009)). An existing provision already barred convicted felons from possessing firearms. See §922(g)(1) (1994 ed.). But many perpetrators of domestic violence are charged with misdemeanors rather than felonies, notwithstanding the harmfulness of their conduct. See *Castleman*, 572 U. S., at \_\_\_ (slip op., at 2). And "[f]irearms and domestic

strife are a potentially deadly combination." *Hayes,* 555 U. S., at 427. Accordingly, Congress added §922(g)(9) to prohibit any person convicted of a "misdemeanor crime of domestic violence" from possessing any gun or ammunition with a connection to interstate commerce. And it defined that phrase, in §921(a)(33)(A), to include a misdemeanor under federal, state, or tribal law, committed by a person with a specified domestic relationship with the victim, that "has, as an element, the use or attempted use of physical force."

Two Terms ago, this Court considered the scope of that definition in a case involving a conviction for a knowing or intentional assault. See *Castleman*, 572 U. S., at ___–___ (slip op., at 4–13). In *Castleman*, we initially held that the word "force" in §921(a)(33)(A) bears its common-law meaning, and so is broad enough to include offensive touching. See *id.*, at ___ (slip op., at 4). We then determined that "the knowing or intentional application of [such] force is a 'use' of force." *Id.,* at ___ (slip op., at 13). But we expressly left open whether a reckless assault also qualifies as a "use" of force—so that a misdemeanor conviction for such conduct would trigger §922(g)(9)'s firearms ban. See *id.,* at ___, n. 8 (slip op., at 11, n. 8). The two cases before us now raise that issue.

Petitioner Stephen Voisine pleaded guilty in 2004 to assaulting his girlfriend in violation of §207 of the Maine Criminal Code, which makes it a misdemeanor to "intentionally, knowingly or recklessly cause[ ] bodily injury or offensive physical contact to another person." Me. Rev. Stat. Ann., Tit. 17–A, §207(1)(A). Several years later, Voisine again found himself in legal trouble, this time for killing a bald eagle. See 16 U. S. C. §668(a). While investigating that crime, law enforcement officers learned that Voisine owned a rifle. When a background check turned up his prior misdemeanor conviction, the Government

charged him with violating 18 U. S. C. §922(g)(9).[1]

Petitioner William Armstrong pleaded guilty in 2008 to assaulting his wife in violation of a Maine domestic violence law making it a misdemeanor to commit an assault prohibited by §207 (the general statute under which Voisine was convicted) against a family or household member. See Me. Rev. Stat. Ann., Tit. 17–A, §207–A(1)(A). A few years later, law enforcement officers searched Armstrong's home as part of a narcotics investigation. They discovered six guns, plus a large quantity of ammunition. Like Voisine, Armstrong was charged under §922(g)(9) for unlawfully possessing firearms.

Both men argued that they were not subject to §922(g)(9)'s prohibition because their prior convictions (as the Government conceded) could have been based on reckless, rather than knowing or intentional, conduct. The District Court rejected those claims. Each petitioner then entered a guilty plea conditioned on the right to appeal the District Court's ruling.

The Court of Appeals for the First Circuit affirmed the two convictions, holding that "an offense with a *mens rea* of recklessness may qualify as a 'misdemeanor crime of violence' under §922(g)(9)." *United States* v. *Armstrong*, 706 F. 3d 1, 4 (2013); see *United States* v. *Voisine*, 495 Fed. Appx. 101, 102 (2013) (*per curiam*). Voisine and Armstrong filed a joint petition for certiorari, and shortly after issuing *Castleman*, this Court (without opinion) vacated the First Circuit's judgments and remanded the cases for further consideration in light of that decision.

---

[1] In *United States* v. *Hayes*, 555 U. S. 415, 418 (2009), this Court held that a conviction under a general assault statute like §207 (no less than one under a law targeting only domestic assault) can serve as the predicate offense for a §922(g)(9) prosecution. When that is so, the Government must prove in the later, gun possession case that the perpetrator and the victim of the assault had one of the domestic relationships specified in §921(a)(33)(A). See *id.,* at 426.

See *Armstrong* v. *United States*, 572 U. S. ___ (2014). On
remand, the Court of Appeals again upheld the convic-
tions, on the same ground. See 778 F. 3d 176, 177 (2015).

We granted certiorari, 577 U. S. ___ (2015), to resolve a
Circuit split over whether a misdemeanor conviction for
recklessly assaulting a domestic relation disqualifies an
individual from possessing a gun under §922(g)(9).[2] We
now affirm.

## II

The issue before us is whether §922(g)(9) applies to
reckless assaults, as it does to knowing or intentional
ones. To commit an assault recklessly is to take that
action with a certain state of mind (or *mens rea*)—in the
dominant formulation, to "consciously disregard[ ]" a
substantial risk that the conduct will cause harm to an-
other. ALI, Model Penal Code §2.02(2)(c) (1962); Me. Rev.
Stat. Ann., Tit. 17–A, §35(3) (Supp. 2015) (adopting that
definition); see *Farmer* v. *Brennan*, 511 U. S. 825, 836–837
(1994) (noting that a person acts recklessly only when he
disregards a substantial risk of harm "of which he is
aware"). For purposes of comparison, to commit an as-
sault knowingly or intentionally (the latter, to add yet
another adverb, sometimes called "purposefully") is to act
with another state of mind respecting that act's conse-
quences—in the first case, to be "aware that [harm] is
practically certain" and, in the second, to have that result
as a "conscious object." Model Penal Code §§2.02 (2)(a)–
(b); Me. Rev. Stat. Ann., Tit. 17–A, §§35(1)–(2).

Statutory text and background alike lead us to conclude
that a reckless domestic assault qualifies as a "misde-
meanor crime of domestic violence" under §922(g)(9).

―――――――

[2] Compare 778 F. 3d 176 (CA1 2015) (case below) with *United States*
v. *Nobriga*, 474 F. 3d 561 (CA9 2006) (*per curiam*) (holding that a
conviction for a reckless domestic assault does not trigger §922(g)(9)'s
ban).

Congress defined that phrase to include crimes that necessarily involve the "use . . . of physical force." §921(a)(33)(A). Reckless assaults, no less than the knowing or intentional ones we addressed in *Castleman*, satisfy that definition. Further, Congress enacted §922(g)(9) in order to prohibit domestic abusers convicted under run-of-the-mill misdemeanor assault and battery laws from possessing guns. Because fully two-thirds of such state laws extend to recklessness, construing §922(g)(9) to exclude crimes committed with that state of mind would substantially undermine the provision's design.

## A

Nothing in the word "use"—which is the only statutory language either party thinks relevant—indicates that §922(g)(9) applies exclusively to knowing or intentional domestic assaults. Recall that under §921(a)(33)(A), an offense counts as a "misdemeanor crime of domestic violence" only if it has, as an element, the "use" of force. Dictionaries consistently define the noun "use" to mean the "act of employing" something. Webster's New International Dictionary 2806 (2d ed. 1954) ("[a]ct of employing anything"); Random House Dictionary of the English Language 2097 (2d ed. 1987) ("act of employing, using, or putting into service"); Black's Law Dictionary 1541 (6th ed. 1990) ("[a]ct of employing," "application").[3] On that common understanding, the force involved in a qualifying assault must be volitional; an involuntary motion, even a powerful one, is not naturally described as an active em-

_____

[3] In cases stretching back over a century, this Court has followed suit, although usually discussing the verb form of the word. See, *e.g.*, *Bailey* v. *United States*, 516 U. S. 137, 145 (1995) (to use means "'[t]o convert to one's service,' 'to employ,' [or] 'to avail oneself of'"); *Smith* v. *United States*, 508 U. S. 223, 229 (1993) (to use means "'[t]o convert to one's service' or 'to employ'"); *Astor* v. *Merritt*, 111 U. S. 202, 213 (1884) (to use means "to employ [or] to derive service from").

ployment of force. See *Castleman*, 572 U. S., at ___ (slip op., at 13) ("[T]he word 'use' conveys the idea that the thing used (here, 'physical force') has been made the user's instrument" (some internal quotation marks omitted)). But the word "use" does not demand that the person applying force have the purpose or practical certainty that it will cause harm, as compared with the understanding that it is substantially likely to do so. Or, otherwise said, that word is indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct.

Consider a couple of examples to see the ordinary meaning of the word "use" in this context. If a person with soapy hands loses his grip on a plate, which then shatters and cuts his wife, the person has not "use[d]" physical force in common parlance. But now suppose a person throws a plate in anger against the wall near where his wife is standing. That hurl counts as a "use" of force even if the husband did not know for certain (or have as an object), but only recognized a substantial risk, that a shard from the plate would ricochet and injure his wife. Similarly, to spin out a scenario discussed at oral argument, if a person lets slip a door that he is trying to hold open for his girlfriend, he has not actively employed ("used") force even though the result is to hurt her. But if he slams the door shut with his girlfriend following close behind, then he has done so—regardless of whether he thinks it absolutely sure or only quite likely that he will catch her fingers in the jamb. See Tr. of Oral Arg. 10–11 (counsel for petitioners acknowledging that this example involves "the use of physical force"). Once again, the word "use" does not exclude from §922(g)(9)'s compass an act of force carried out in conscious disregard of its substantial risk of causing harm.

And contrary to petitioners' view, nothing in *Leocal* v. *Ashcroft*, 543 U. S. 1 (2004), suggests a different conclu-

sion—*i.e.*, that "use" marks a dividing line between reckless and knowing conduct. See Brief for Petitioners 18–22. In that decision, this Court addressed a statutory definition similar to §921(a)(33)(A): there, "the use . . . of physical force against the person or property of another." 18 U. S. C. §16. That provision excludes "merely accidental" conduct, *Leocal* held, because "it is [not] natural to say that a person actively employs physical force against another person by accident." 543 U. S., at 9. For example, the Court stated, one "would not ordinarily say a person 'use[s] . . . physical force against' another by stumbling and falling into him." *Ibid.* That reasoning fully accords with our analysis here. Conduct like stumbling (or in our hypothetical, dropping a plate) is a true accident, and so too the injury arising from it; hence the difficulty of describing that conduct as the "active employment" of force. *Ibid.* But the same is not true of reckless behavior—acts undertaken with awareness of their substantial risk of causing injury (in our contrasting hypo, hurling the plate). The harm such conduct causes is the result of a deliberate decision to endanger another—no more an "accident" than if the "substantial risk" were "practically certain." See *supra,* at 4 (comparing reckless and knowing acts). And indeed, *Leocal* itself recognized the distinction between accidents and recklessness, specifically reserving the issue whether the definition in §16 embraces reckless conduct, see 543 U. S*.,* at 13—as we now hold §921(a)(33)(A) does.[4]

—————

[4]Like *Leocal*, our decision today concerning §921(a)(33)(A)'s scope does not resolve whether §16 includes reckless behavior. Courts have sometimes given those two statutory definitions divergent readings in light of differences in their contexts and purposes, and we do not foreclose that possibility with respect to their required mental states. Cf. *United States* v. *Castleman*, 572 U. S. \_\_\_, \_\_\_, n. 4 (2014) (slip op., at 6, n. 4) (interpreting "force" in §921(a)(33)(A) to encompass any offensive touching, while acknowledging that federal appeals courts have usually read the same term in §16 to reach only "violent force"). All we say here is that *Leocal*'s exclusion of accidental conduct from a

In sum, Congress's definition of a "misdemeanor crime of violence" contains no exclusion for convictions based on reckless behavior. A person who assaults another recklessly "use[s]" force, no less than one who carries out that same action knowingly or intentionally. The relevant text thus supports prohibiting petitioners, and others with similar criminal records, from possessing firearms.

### B

So too does the relevant history. As explained earlier, Congress enacted §922(g)(9) in 1996 to bar those domestic abusers convicted of garden-variety assault or battery misdemeanors—just like those convicted of felonies—from owning guns. See *supra,* at 1–2; *Castleman*, 572 U. S., at ___, ___ (slip op., at 2, 6); *Hayes*, 555 U. S., at 426–427. Then, as now, a significant majority of jurisdictions—34 States plus the District of Columbia—defined such misdemeanor offenses to include the reckless infliction of bodily harm. See Brief for United States 7a–19a (collecting statutes). That agreement was no coincidence. Several decades earlier, the Model Penal Code had taken the position that a *mens rea* of recklessness should generally suffice to establish criminal liability, including for assault. See §2.02(3), Comments 4–5, at 243–244 ("purpose, knowledge, and recklessness are properly the basis for" such liability); §211.1 (defining assault to include "purposely, knowingly, or recklessly caus[ing] bodily injury"). States quickly incorporated that view into their misdemeanor assault and battery statutes. So in linking §922(g)(9) to those laws, Congress must have known it was sweeping in some persons who had engaged in reckless conduct. See, *e.g., United States* v. *Bailey*, 9 Pet. 238, 256 (1835) (Story, J.) ("Congress must be presumed to have

definition hinging on the "use" of force is in no way inconsistent with our inclusion of reckless conduct in a similarly worded provision.

legislated under this known state of the laws"). And indeed, that was part of the point: to apply firearms restrictions to those abusers, along with all others, whom the States' ordinary misdemeanor assault laws covered.

What is more, petitioners' reading risks rendering §922(g)(9) broadly inoperative in the 35 jurisdictions with assault laws extending to recklessness—that is, inapplicable even to persons who commit that crime knowingly or intentionally. Consider Maine's statute, which (in typical fashion) makes it a misdemeanor to "intentionally, knowingly or recklessly" injure another. Me. Rev. Stat. Ann., Tit. 17–A, §207(1)(A). Assuming that provision defines a single crime (which happens to list alternative mental states)—and accepting petitioners' view that §921(a)(33)(A) requires at least a knowing *mens rea*—then, under *Descamps* v. *United States*, 570 U. S. \_\_\_ (2013), *no* conviction obtained under Maine's statute could qualify as a "misdemeanor crime of domestic violence." See *id.,* at \_\_\_ (slip op., at 5) (If a state crime "sweeps more broadly" than the federally defined one, a conviction for the state offense "cannot count" as a predicate, no matter what *mens rea* the defendant actually had). So in the 35 jurisdictions like Maine, petitioners' reading risks allowing domestic abusers of all mental states to evade §922(g)(9)'s firearms ban. In *Castleman*, we declined to construe §921(a)(33)(A) so as to render §922(g)(9) ineffective in 10 States. See 572 U. S., at \_\_\_ (slip op., at 9). All the more so here, where petitioners' view would jeopardize §922(g)(9)'s force in several times that many.

Petitioners respond that we should ignore the assault and battery laws actually on the books when Congress enacted §922(g)(9). In construing the statute, they urge, we should look instead to how the common law defined those crimes in an earlier age. See Brief for Petitioners 13–15. And that approach, petitioners claim, would necessitate reversing their convictions because the common law

"required a *mens rea* greater than recklessness." *Id.,* at 17.

But we see no reason to wind the clock back so far. Once again: Congress passed §922(g)(9) to take guns out of the hands of abusers convicted under the misdemeanor assault laws then in general use in the States. See *supra,* at 1–2, 8. And by that time, a substantial majority of jurisdictions, following the Model Penal Code's lead, had abandoned the common law's approach to *mens rea* in drafting and interpreting their assault and battery statutes. Indeed, most had gone down that road decades before. That was the backdrop against which Congress was legislating. Nothing suggests that, in enacting §922(g)(9), Congress wished to look beyond that real world to a common-law precursor that had largely expired. To the contrary, such an approach would have undermined Congress's aim by tying the ban on firearms possession not to the laws under which abusers are prosecuted but instead to a legal anachronism.[5]

And anyway, we would not know how to resolve whether recklessness sufficed for a battery conviction at common law. Recklessness was not a word in the common law's standard lexicon, nor an idea in its conceptual framework;

––––––––––

[5]As petitioners observe, this Court looked to the common law in *Castleman* to define the term "force" in §921(a)(33)(A). See 572 U. S., at \_\_\_–\_\_\_ (slip op., at 4–5); Brief for Petitioners 13–15. But we did so for reasons not present here. "Force," we explained, was "a common-law term of art" with an "established common-law meaning." 572 U. S*.,* at \_\_\_ (slip op., at 5) (internal quotation marks omitted). And we thought that Congress meant to adhere to that meaning given its "perfect[ ]" fit with §922(g)(9)'s goal. *Ibid.* By contrast, neither party pretends that the statutory term "use"—the only one identified as potentially relevant here—has any particular common-law definition. And as explained above, the watershed change in how state legislatures thought of *mens rea* after the Model Penal Code makes the common law a bad match for the ordinary misdemeanor assault and battery statutes in Congress's sightline.

only in the mid- to late-1800's did courts begin to address reckless behavior in those terms. See Hall, Assault and Battery by the Reckless Motorist, 31 J. Crim. L. & C. 133, 138–139 (1940). The common law traditionally used a variety of overlapping and, frankly, confusing phrases to describe culpable mental states—among them, specific intent, general intent, presumed intent, willfulness, and malice. See, *e.g., Morissette* v. *United States*, 342 U. S. 246, 252 (1952); Model Penal Code §2.02, Comment 1, at 230. Whether and where conduct that we would today describe as reckless fits into that obscure scheme is anyone's guess: Neither petitioners' citations, nor the Government's competing ones, have succeeded in resolving that counterfactual question. And that indeterminacy confirms our conclusion that Congress had no thought of incorporating the common law's treatment of *mens rea* into §921(a)(33)(A). That provision instead corresponds to the ordinary misdemeanor assault and battery laws used to prosecute domestic abuse, regardless of how their mental state requirements might—or, then again, might not— conform to the common law's.[6]

---

[6] Petitioners make two last arguments for reading §921(a)(33)(A) their way, but they do not persuade us. First, petitioners contend that we should adopt their construction to avoid creating a question about whether the Second Amendment permits imposing a lifetime firearms ban on a person convicted of a misdemeanor involving reckless conduct. See Brief for Petitioners 32–36. And second, petitioners assert that the rule of lenity requires accepting their view. See *id.,* at 31–32. But neither of those arguments can succeed if the statute is clear. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) (noting that "the doctrine of constitutional doubt . . . enters in only where a statute is susceptible of two constructions" (internal quotation marks omitted)); *Abramski* v. *United States*, 573 U. S. \_\_\_, \_\_\_, n. 10 (2014) (slip op., at 18, n. 10) (stating that the rule of lenity applies only in cases of genuine ambiguity). And as we have shown, §921(a)(33)(A) plainly encompasses reckless assaults.

### III

The federal ban on firearms possession applies to any person with a prior misdemeanor conviction for the "use . . . of physical force" against a domestic relation. §921(a)(33)(A). That language, naturally read, encompasses acts of force undertaken recklessly—*i.e.,* with conscious disregard of a substantial risk of harm. And the state-law backdrop to that provision, which included misdemeanor assault statutes covering reckless conduct in a significant majority of jurisdictions, indicates that Congress meant just what it said. Each petitioner's possession of a gun, following a conviction under Maine law for abusing a domestic partner, therefore violates §922(g)(9). We accordingly affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–10154

———————

## STEPHEN L. VOISINE AND WILLIAM E. ARMSTRONG, III, PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 27, 2016]

JUSTICE THOMAS, with whom JUSTICE SOTOMAYOR joins as to Parts I and II, dissenting.

Federal law makes it a crime for anyone previously convicted of a "misdemeanor crime of domestic violence" to possess a firearm "in or affecting commerce." 18 U. S. C. §922(g)(9). A "misdemeanor crime of domestic violence" includes "an offense that . . . has, as an element, the use or attempted use of physical force . . . committed by [certain close family members] of the victim." §921(a)(33)(A)(ii). In this case, petitioners were convicted under §922(g)(9) because they possessed firearms and had prior convictions for assault under Maine's statute prohibiting "intentionally, knowingly or recklessly caus[ing] bodily injury or offensive physical contact to another person." Me. Rev. Stat. Ann., Tit. 17–A, §207(1)(A) (2006). The question presented is whether a prior conviction under §207 has, as an element, the "use of physical force," such that the conviction can strip someone of his right to possess a firearm. In my view, §207 does not qualify as such an offense, and the majority errs in holding otherwise. I respectfully dissent.

## I

To qualify as a "'misdemeanor crime of domestic violence,'" the Maine assault statute must have as an element the "use of physical force." §921(a)(33)(A)(ii). Be-

cause mere recklessness is sufficient to sustain a conviction under §207, a conviction does not necessarily involve the "use" of physical force, and thus, does not trigger §922(g)(9)'s prohibition on firearm possession.

## A

Three features of §921(a)(33)(A)(ii) establish that the "use of physical force" requires intentional conduct. First, the word "use" in that provision is best read to require intentional conduct. As the majority recognizes, the noun "use" means "the 'act of employing' something." *Ante,* at 5 (quoting dictionaries). A "use" is "[t]he act of employing a thing for any . . . purpose." 19 Oxford English Dictionary 350 (2d ed. 1989). To "use" something, in other words, is to employ the thing for its instrumental value, *i.e.,* to employ the thing to accomplish a further goal. See *United States* v. *Castleman*, 572 U. S. ___, ___ (2014) (slip op., at 13). A "use," therefore, is an inherently intentional act— that is, an act done for the purpose of causing certain consequences or at least with knowledge that those consequences will ensue. See Restatement (Second) of Torts §8A, p. 15 (1965) (defining intentional acts).

We have routinely defined "use" in ways that make clear that the conduct must be intentional. In *Bailey* v. *United States*, 516 U. S. 137 (1995), for example, we held that the phrase "[use of] a firearm" required "active employment" of the firearm, such as "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Id.,* at 143, 148 (emphasis deleted). We have similarly held that the use of force requires more than "negligent or merely accidental conduct." *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004). We concluded that "[w]hile one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident." *Ibid.* Thus, shooting a gun would be using a

firearm in relation to a crime. *Bailey*, *supra*, at 148. Recklessly leaving a loaded gun in one's trunk, which then discharges after being jostled during the car ride, would not. The person who placed that gun in the trunk might have acted recklessly or negligently, but he did not actively employ the gun in a crime.

Second, especially in a legal context, "force" generally connotes the use of violence against another. Black's Law Dictionary, for example, defines "force" to mean "[p]ower, violence, or pressure directed against a person or thing." Black's Law Dictionary 656 (7th ed. 1999). Other dictionaries offer similar definitions. *E.g.,* Random House Dictionary of the English Language 748 (def. 5) (2d ed. 1987) ("force," when used in law, means "unlawful violence threatened or committed against persons or property"); 6 Oxford English Dictionary 34 (def. I(5)(c)) ("Unlawful violence offered to persons or things"). And "violence," when used in a legal context, also implies an intentional act. See Black's Law Dictionary 1564 ("violence" is the "[u]njust or unwarranted use of force, usu. accompanied by fury, vehemence, or outrage; physical force unlawfully exercised with the intent to harm").[1] When a person talks about "using force" against another, one thinks of intentional acts—punching, kicking, shoving, or using a weapon.

————————

[1] Some of our cases have distinguished "violent force"—force capable of causing physical injury—and common-law force, which included all nonconsensual touching, see *Johnson* v. *United States*, 559 U. S. 133, 140–141 (2010), but others have not, see *United States* v. *Castleman*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 5). The common law did not draw this distinction because the common law considered nonconsensual touching as a form of violence against the person. 3 W. Blackstone, Commentaries *120 ("[T]he law cannot draw the line between different degrees of violence, and therefore totally prohibits the first and lowest stage of it"). The Court should assume that, absent a contrary textual indication, Congress legislated against this common-law backdrop. See *Castleman, supra*, at \_\_\_ (slip op., at 4). Consequently, I treat nonconsensual touching as a type of violence.

Conversely, one would not naturally call a car accident a "use of force," even if people were injured by the force of the accident. As Justice Holmes observed, "[E]ven a dog distinguishes between being stumbled over and being kicked." O. Holmes, The Common Law 3 (1881).

Third, context confirms that "use of physical force" connotes an intentional act. Section 921(a)(33)(A)(ii)'s prohibitions also include "the threatened use of a deadly weapon." In that neighboring prohibition, "use" most naturally means active employment of the weapon. And it would be odd to say that "use" in that provision refers to active employment (an intentional act) when threatening someone with a weapon, but "use" here is satisfied by merely reckless conduct. See *Sorenson* v. *Secretary of Treasury*, 475 U. S. 851, 860 (1986) (the same words in a statute presumptively have the same meaning). Thus, the "use of physical force" against a family member refers to intentional acts of violence against a family member.

B

On this interpretation, Maine's assault statute likely does not qualify as a "misdemeanor crime of domestic violence" and thus does not trigger the prohibition on possessing firearms, §922(g)(9). The Maine statute appears to lack, as a required element, the "use or attempted use of physical force." Maine's statute punishes at least some conduct that does not involve the "use of physical force." Section 207 criminalizes "recklessly caus[ing] bodily injury or offensive physical contact to another person." By criminalizing all reckless conduct, the Maine statute captures conduct such as recklessly injuring a passenger by texting while driving resulting in a crash. Petitioners' charging documents generically recited the statutory language; they did not charge intentional, knowing, and reckless harm as alternative counts. Accordingly, Maine's statute appears to treat "intentionally, knowingly,

or recklessly" causing bodily injury or an offensive touching as a single, indivisible offense that is satisfied by recklessness. See *Mathis* v. *United States, ante*, at 14–15. So petitioners' prior assault convictions do not necessarily have as an element the use of physical force against a family member. These prior convictions, therefore, do not qualify as a misdemeanor crime involving domestic violence under federal law, and petitioners' convictions accordingly should be reversed. At the very least, to the extent there remains uncertainty over whether Maine's assault statute is divisible, the Court should vacate and remand for the First Circuit to determine that statutory interpretation question in the first instance.

## II

To illustrate where I part ways with the majority, consider different mental states with which a person could create and apply force.[2] First, a person can create force intentionally or recklessly.[3] For example, a person can intentionally throw a punch or a person can crash his car by driving recklessly. Second, a person can intentionally or recklessly harm a particular person or object as a result of that force. For example, a person could throw a punch at a particular person (thereby intentionally applying force to that person) or a person could swing a baseball bat too close to someone (thereby recklessly applying force to that person).

These different mental states give rise to three relevant

_____

[2] Although "force" generally has a narrower legal connotation of intentional acts designed to cause harm, see *supra,* at 3–4, I will use "force" in this Part in its broadest sense to mean "strength or power exerted upon an object." Random House Dictionary of the English Language 748 (def. 2) (2d ed. 1987).

[3] To simplify, I am using only those mental states relevant to the Court's resolution of this case. A person could also create a force negligently or blamelessly.

categories of conduct. A person might intentionally create force and intentionally apply that force against an object (*e.g.,* punching a punching bag). A person might also intentionally create force but recklessly apply that force against an object (*e.g.,* practicing a kick in the air, but recklessly hitting a piece of furniture). Or a person could recklessly create force that results in damage, such as the car crash example.

The question before us is what mental state suffices for a "use of physical force" against a family member. In my view, a "use of physical force" most naturally refers to cases where a person intentionally creates force and intentionally applies that force against a family member. It also includes (at least some) cases where a person intentionally creates force but recklessly applies it to a family member. But I part ways with the majority's conclusion that purely reckless conduct—meaning, where a person recklessly creates force—constitutes a "use of physical force." In my view, it does not, and therefore, the "use of physical force" is narrower than most state assault statutes, which punish anyone who recklessly causes physical injury.

## A

To identify the scope of the "use of physical force," consider three different types of intentional and reckless force resulting in physical injury.

### 1

The paradigmatic case of battery: A person intentionally unleashes force and intends that the force will harm a particular person. This might include, for example, punching or kicking someone. Both the majority and I agree that these cases constitute a "use of physical force" under §921(a)(33)(A)(ii).

This first category includes all cases where a person

intentionally creates force and desires or knows with a practical certainty that that force will cause harm. This is because the law traditionally treats conduct as intended in two circumstances. First, conduct is intentional when the actor desires to produce a specific result. 1 W. LaFave, Substantive Criminal Law §5.2(a), pp. 340–342 (2d ed. 2003). But conduct is also traditionally deemed intentional when a person acts "knowingly": that is, he knows with practical certainty that a result will follow from his conduct. *Ibid.*; see also Restatement (Second) of Torts §8A, Comment *b*, at 15 ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result").

To illustrate, suppose a person strikes his friend for the purpose of demonstrating a karate move. The person has no desire to injure his friend, but he knows that the move is so dangerous that he is practically certain his friend will be injured. Under the common law, the person intended to injure his friend, even though he acted only with knowledge that his friend would be injured rather than the desire to harm him. Thus, even when a person acts knowingly rather than purposefully, this type of conduct is still a "use of physical force."

2

The second category involves a person who intentionally unleashes force that recklessly causes injury. The majority gives two examples:

1. The Angry Plate Thrower: "[A] person throws a plate in anger against the wall near where his wife is standing." *Ante,* at 6. The plate shatters, and a shard injures her. *Ibid.*

2. The Door Slammer: "[A person] slams the door shut with his girlfriend following close behind" with the effect of "catch[ing] her fingers in the jamb." *Ibid.*

The Angry Plate Thrower and the Door Slammer both intentionally unleashed physical force, but they did not intend to direct that force at those whom they harmed. Thus, they *intentionally* employed force, but *recklessly* caused physical injury with that force. The majority believes that these cases also constitute a "use of physical force," and I agree. The Angry Plate Thrower has used force against the plate, and the Door Slammer has used force against the door.

The more difficult question is whether this "use of physical force" comes within §921(a)(33)(A)(ii), which requires that the "use of physical force" be committed by someone having a familial relationship with the victim. The natural reading of that provision is that the use of physical force must be against a family member. In some cases, the law readily transfers the intent to use force from the object to the actual victim. Take the Angry Plate Thrower: If a husband throws a plate at the wall near his wife to scare her, that is assault. If the plate breaks and cuts her, it becomes a battery, regardless of whether he intended the plate to make contact with her person. See W. Keeton, D. Dobbs, R. Keeton, & D. Owens, Prosser and Keeton on Law of Torts §9, pp. 39–42 (5th ed. 1984) (Prosser and Keeton). Similarly, "if one person intends to harm a second person but instead unintentionally harms a third, the first person's criminal or tortious intent toward the second applies to the third as well." Black's Law Dictionary 1504 (defining transferred-intent doctrine); see also 1 LaFave, *supra*, §5.2(c)(4), at 349–350. Thus, where a person acts in a violent and patently unjustified manner, the law will often impute that the actor intended to cause the injury resulting from his conduct, even if he actually intended to direct his use of force elsewhere. Because we presume that Congress legislates against the backdrop of the common law, see *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991), these cases would qualify as the

"use of physical force" against a family member.[4]

### 3

Finally, and most problematic for the majority's approach, a person could recklessly unleash force that recklessly causes injury. Consider two examples:

1. The Text-Messaging Dad: Knowing that he should not be texting and driving, a father sends a text message to his wife. The distraction causes the father to rear end the car in front of him. His son, who is a passenger, is injured.

2. The Reckless Policeman: A police officer speeds to a crime scene without activating his emergency lights and siren and careens into another car in an intersection. That accident causes the police officer's car to strike another police officer, who was standing at the intersection. See *Seaton* v. *State*, 385 S. W. 3d 85, 88 (Tex. App. 2012).

In these cases, both the unleashing of the "force" (the car crash) and the resulting harm (the physical injury) were reckless. Under the majority's reading of §921(a)(33)(A)(ii), the husband "use[d] . . . physical force" against his son, and the police officer "use[d] . . . physical force" against the other officer.

But this category is where the majority and I part company. These examples do not involve the "use of physical force" under any conventional understanding of "use" because they do not involve an active employment of something for a particular purpose. See *supra,* at 2–3. In

---

[4] The Door Slammer might also fit within the "use of physical force," although that is a harder question. The Door Slammer has used force against the door, which has then caused injury to his girlfriend. But traditional principles of law would not generally transfer the actor's intent to use force against the door to the girlfriend because, unlike placing someone in fear of bodily injury, slamming a door is not inherently wrongful and illegal conduct.

the second category, the actors intentionally use violence against property; this is why the majority can plausibly argue that they have "used" force, even though that force was not intended to harm their family members. See *supra,* at 8–9 (discussing transferred intent). But when an individual does not engage in any violence against persons or property—that is, when physical injuries result from purely reckless conduct—there is no "use" of physical force.

*       *       *

The "use of physical force" against a family member includes cases where a person intentionally commits a violent act against a family member. And the term includes at least some cases where a person engages in a violent act that results in an unintended injury to a family member. But the term does not include nonviolent, reckless acts that cause physical injury or an offensive touching. Accordingly, the majority's definition is overbroad.

## B

In reaching its contrary conclusion, the majority confuses various concepts. First, and as discussed, the majority decides that a person who acts recklessly has used physical force against another. *Ante,* at 6–8. But that fails to appreciate the distinction between intentional and reckless conduct. A "use" of physical force requires the intent to cause harm, and the law will impute that intent where the actor knows with a practical certainty that it will cause harm. But the law will not impute that intent from merely reckless conduct. Second, and perhaps to rein in its overly broad conception of a use of force, the majority concludes that only "volitional" acts constitute uses of force, *ante,* at 6, and that mere "accident[s]" do not, *ante,* at 7. These portions of the majority's analysis conflate "volitional" conduct with "intentional" *mens rea* and mis-

apprehends the relevant meaning of an "accident."

1

The majority blurs the distinction between recklessness and intentional wrongdoing by overlooking the difference between the *mens rea* for force and the *mens rea* for causing harm with that force. The majority says that "'use' does not demand that the person applying force have the purpose or practical certainty that it will cause harm" (namely, knowledge), "as compared with the understanding that it is [a substantial and unjustifiable risk that it will] do so" (the standard for recklessness).[5] *Ante,* at 6. Put in the language of *mens rea*, the majority is saying that purposeful, knowing, and reckless applications of force are all equally "uses" of force.

But the majority fails to explain why mere recklessness in creating force—as opposed to recklessness in causing harm with intentional force—is sufficient. The majority gives the Angry Plate Thrower and the Door Slammer as examples of reckless conduct that are "uses" of physical force, but those examples involve persons who *intentionally* use force that *recklessly* causes injuries. *Ibid.* Reckless assault, however, extends well beyond intentional force that recklessly causes injury. In States where the Model Penal Code has influence, reckless assault includes any recklessly caused physical injury. See ALI, Model Penal Code §211.1(1)(a) (1980). This means that the Reckless

—————

[5] The majority's equation of recklessness with "the understanding" that one's actions are "substantially likely" to cause harm, *ante*, at 6, misstates the standard for recklessness in States that follow the Model Penal Code. Recklessness only requires a "substantial and unjustifiable risk." ALI, Model Penal Code §2.02(2)(c) (1980). A "substantial" risk can include very small risks when there is no justification for taking the risk. See *id.*, §2.02, Comment 1, at 237, n. 14. Thus, it would be reckless to play Russian roulette with a revolver having 1,000 chambers, even though there is a 99.9% chance that no one will be injured.

Policeman and the Text-Messaging Dad are as guilty of assault as the Angry Plate Thrower.  See, *e.g., Seaton*, 385 S. W. 3d, at 89–90; see also *People* v. *Grenier*, 250 App. Div. 2d 874, 874–875, 672 N. Y. S. 2d 499, 500–501 (1998) (upholding an assault conviction where a drunk driver injured his passengers in a car accident).

The majority's examples are only those in which a person has intentionally used force, meaning that the person acts with purpose or knowledge that force is involved. *Ante,* at 6.  As a result, the majority overlooks the critical distinction between conduct that is intended to cause harm and conduct that is not intended to cause harm. Violently throwing a plate against a wall is a use of force. Speeding on a roadway is not.  That reflects the fundamental difference between intentional and reckless wrongdoing.  An intentional wrong is designed to inflict harm.  See Restatement (Second) of Torts §8A, at 15.  A reckless wrong is not: "While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it."  *Id.*, §500, Comment *f*, at 590.

All that remains of the majority's analysis is its unsupported conclusion that recklessness looks enough like knowledge, so that the former suffices for a use of force just as the latter does.  *Ante*, at 6.  That overlooks a crucial distinction between a "practical certainty" and a substantial risk.  When a person acts with practical certainty, he intentionally produces a result.  As explained above, *supra,* at 7, when a person acts with knowledge that certain consequences will result, the law imputes to that person the intent to cause those consequences.  And the requirement of a "practical" certainty reflects that, in ordinary life, people rarely have perfect certitude of the facts that they "know."  But as the probability decreases, "the actor's conduct loses the character of intent, and becomes mere recklessness."  Restatement (Second) of Torts §8A, Com-

ment *b*, at 15. And the distinction between intentional and reckless conduct is key for defining "use." When a person acts with a practical certainty that he will employ force, he intends to cause harm; he has actively employed force for an instrumental purpose, and that is why we can fairly say he "uses" force. In the case of reckless wrongdoing, however, the injury the actor has caused is just an accidental byproduct of inappropriately risky behavior; he has not actively employed force.

In sum, "use" requires the intent to employ the thing being used. And in law, that intent will be imputed when a person acts with practical certainty that he will actively employ that thing. Merely disregarding a risk that a harm will result, however, does not supply the requisite intent.

### 2

To limit its definition of "use," the majority adds two additional requirements. The conduct must be "volitional," and it cannot be merely "accident[al]." *Ante,* at 5–7. These additional requirements will cause confusion, and neither will limit the breadth of the majority's adopted understanding of a "use of physical force."

First, the majority requires that the use of force must be "volitional," so that "an involuntary motion, even a powerful one, is not naturally described as an active employment of force." *Ante,* at 5–6. The majority provides two examples:

> 1. The Soapy-Handed Husband: "[A] person with soapy hands loses his grip on a plate, which then shatters and cuts his wife." *Ante,* at 6.
> 2. The Chivalrous Door Holder: "[A] person lets slip a door that he is trying to hold open for his girlfriend." *Ibid.*

In the majority's view, a husband who loses his grip on a

plate or a boyfriend who lets the door slip has not engaged in a volitional act creating force. *Ibid.* The majority distinguishes this "volitional" act requirement from the "mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct." *Ibid.* The Angry Plate Thrower—unlike the Soapy-Handed Husband or Chivalrous Door Holder—has engaged in a volitional act, even if he did not intend to hurl the plate at his wife. *Ibid.*

The majority's use of "volitional" is inconsistent with its traditional legal definition. The husband who drops a dish on his wife's foot and the boyfriend who loses his grip while holding the door have acted volitionally. "[A]n 'act,' as that term is ordinarily used, is a voluntary contraction of the muscles, and nothing more." Prosser and Keeton §8, at 34; see also Model Penal Code §2.01 (defining the voluntary act requirement). For the plate and door examples not to be volitional acts, they would need to be unwilled muscular movements, such as a person who drops the plate because of a seizure.

In calling the force in these cases nonvolitional, the majority has confounded the minimum *mens rea* generally necessary to trigger criminal liability (recklessness) with the requirement that a person perform a volitional act. Although all involuntary actions are blameless, not all blameless conduct is involuntary.

What the majority means to say is that the men did not *intentionally* employ force, a requirement materially different from a volitional act. And this requirement poses a dilemma for the majority. Recklessly unleashing a force that recklessly causes physical injury—for example, a police officer speeding through the intersection without triggering his lights and siren—is an assault in States that follow the Model Penal Code. See *supra,* at 9. If the majority's rule is to include *all* reckless assault, then the majority must accept that the Text-Messaging Dad is as

guilty of using force against his son as the husband who angrily throws a plate toward his wife—an implausible result. Alternatively, the majority must acknowledge that its "volitional" act requirement is actually a requirement that the use of force be intentional, even if that intentional act of violence results in a recklessly caused, but unintended, injury. The majority, of course, refuses to do so because that approach would remove many assault convictions, especially in the many States that have adopted the Model Penal Code, from the sweep of the federal statute. Thus, the majority is left misapplying basic principles of criminal law to rationalize why all "assault" under the Model Penal Code constitutes the "use of physical force" under §921(a)(33)(A)(ii).

Second and relatedly, the majority asserts that a use of force cannot be merely accidental. But this gloss on what constitutes a use of force provides no further clarity. The majority's attempt to distinguish "recklessness" from an "accident," *ante*, at 7, is an equivocation on the meaning of "accident." An accident can mean that someone was blameless—for example, a driver who accidentally strikes a deer that darts into a roadway. But an accident can also refer to the fact that the result was unintended: A car accident is no less an "accident" just because a driver acted negligently or recklessly. Neither labeling an act "volitional" nor labeling it a mere "accident" will rein in the majority's overly broad understanding of a "use of physical force."

*    *    *

If Congress wanted to sweep in all reckless conduct, it could have written §921(a)(33)(A)(ii) in different language. Congress might have prohibited the possession of firearms by anyone convicted under a state law prohibiting assault or battery. Congress could also have used language tracking the Model Penal Code by saying that a conviction must

have, as an element, "the intentional, knowing, or reckless causation of physical injury." But Congress instead defined a "misdemeanor crime of domestic violence" by requiring that the offense have "the use of physical force." And a "use of physical force" has a well-understood meaning applying only to intentional acts designed to cause harm.

## III

Even assuming any doubt remains over the reading of "use of physical force," the majority errs by reading the statute in a way that creates serious constitutional problems. The doctrine of constitutional avoidance "command[s] courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading." *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 213 (2009) (THOMAS, J., concurring in judgment in part and dissenting in part) (internal quotation marks omitted). Section 922(g)(9) is already very broad. It imposes a lifetime ban on gun ownership for a single intentional nonconsensual touching of a family member. A mother who slaps her 18-year-old son for talking back to her—an intentional use of force—could lose her right to bear arms forever if she is cited by the police under a local ordinance. The majority seeks to expand that already broad rule to any reckless physical injury or nonconsensual touch. I would not extend the statute into that constitutionally problematic territory.

The Second Amendment protects "the right of the people to keep and bear Arms." In *District of Columbia* v. *Heller*, 554 U. S. 570, 624, 627, 635 (2008), the Court held that the Amendment protects the right of all law-abiding citizens to keep and bear arms that are in common use for traditionally lawful purposes, including self-defense. And in *McDonald* v. *Chicago*, 561 U. S. 742 (2010), the Court

held that the right to keep and bear arms is a fundamental right. See *id.,* at 767–778; *id.,* at 806 (THOMAS, J., concurring in part and concurring in judgment).

The protections enumerated in the Second Amendment, no less than those enumerated in the First, are not absolute prohibitions against government regulation. *Heller*, 554 U. S., at 595, 626–627. Traditionally, States have imposed narrow limitations on an individual's exercise of his right to keep and bear arms, such as prohibiting the carrying of weapons in a concealed manner or in sensitive locations, such as government buildings. *Id.,* at 626–627; see, *e.g., State* v. *Kerner*, 181 N. C. 574, 578–579, 107 S. E. 222, 225 (1921). But these narrow restrictions neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms.

Some laws, however, broadly divest an individual of his Second Amendment rights. *Heller* approved, in dicta, laws that prohibit dangerous persons, including felons and the mentally ill, from having arms. 554 U. S., at 626. These laws are not narrow restrictions on the right because they prohibit certain individuals from exercising their Second Amendment rights at all times and in all places. To be constitutional, therefore, a law that broadly frustrates an individual's right to keep and bear arms must target individuals who are beyond the scope of the "People" protected by the Second Amendment.

Section 922(g)(9) does far more than "close [a] dangerous loophole" by prohibiting individuals who had committed felony domestic violence from possessing guns simply because they pleaded guilty to misdemeanors. *Ante,* at 1 (internal quotation marks omitted). It imposes a lifetime ban on possessing a gun for *all* nonfelony domestic offenses, including so-called infractions or summary offenses. §§921(a)(33)(A)(ii), 922(g)(9); 27 CFR §478.11 (2015) (defining a misdemeanor crime of domestic violence to include crimes punishable only by a fine). These infractions, like

traffic tickets, are so minor that individuals do not have a right to trial by jury. See *Lewis* v. *United States*, 518 U. S. 322, 325–326 (1996).

Today the majority expands §922(g)(9)'s sweep into patently unconstitutional territory. Under the majority's reading, a single conviction under a state assault statute for recklessly causing an injury to a family member—such as by texting while driving—can now trigger a lifetime ban on gun ownership. And while it may be true that such incidents are rarely prosecuted, this decision leaves the right to keep and bear arms up to the discretion of federal, state, and local prosecutors.

We treat no other constitutional right so cavalierly. At oral argument the Government could not identify any other fundamental constitutional right that a person could lose forever by a single conviction for an infraction punishable only by a fine. Tr. of Oral Arg. 36–40. Compare the First Amendment. Plenty of States still criminalize libel. See, *e.g.,* Ala. Code. §13A–11–160 (2015); Fla. Stat. §836.01 (2015); La. Rev. Stat. Ann. §14:47 (West 2016); Mass. Gen. Laws, ch. 94, §98C (2014); Minn. Stat. §609.765 (2014); N. H. Rev. Stat. Ann. §644:11 (2007); Va. Code Ann. §18.2–209 (2014); Wis. Stat. §942.01 (2005). I have little doubt that the majority would strike down an absolute ban on publishing by a person previously convicted of misdemeanor libel. In construing the statute before us expansively so that causing a single minor reckless injury or offensive touching can lead someone to lose his right to bear arms forever, the Court continues to "relegat[e] the Second Amendment to a second-class right." *Friedman* v. *Highland Park*, 577 U. S. ___, ___ (2015) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 6).

\*     \*     \*

In enacting §922(g)(9), Congress was not worried about

a husband dropping a plate on his wife's foot or a parent injuring her child by texting while driving. Congress was worried that family members were abusing other family members through acts of violence and keeping their guns by pleading down to misdemeanors. Prohibiting those convicted of intentional and knowing batteries from possessing guns—but not those convicted of reckless batteries—amply carries out Congress' objective.

Instead, under the majority's approach, a parent who has a car accident because he sent a text message while driving can lose his right to bear arms forever if his wife or child suffers the slightest injury from the crash. This is obviously not the correct reading of §922(g)(9). The "use of physical force" does not include crimes involving purely reckless conduct. Because Maine's statute punishes such conduct, it sweeps more broadly than the "use of physical force." I respectfully dissent.